UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X **Docket#**
XU, et al.,                                : 16-cv-04720-RLM
                    Plaintiffs,    :
                                   :
      - versus -                   : U.S. Courthouse
                                   : Brooklyn, New York
                                   :
JESSICA HOLDING, INC., et al.,: July 7, 2017
             Defendants     :
------------------------------X

   TRANSCRIPT OF CIVIL CAUSE FOR SETTLEMENT CONFERENCE
        BEFORE THE HONORABLE ROANNE L. MANN
          UNITED STATES MAGISTRATE JUDGE

**A    P    P    E    A    R    A    N    C    E    S:**



**For the Plaintiff**:          **Kibum Byun, Esq.**
                                Troy Law, PLLC
                                41-25 Kissena Blvd Suite 119
                                Flushing, NY 11355


**For the Defendant**:          **Michael G. Santangelo, Esq.**
                                Law Offices of
                                Michael G. Santangelo
                                75 South Broadway
                                White Plains, NY 10601




**Transcription Service**:      **Transcriptions Plus II, Inc.**
                                61 Beatrice Avenue
                                West Islip, New York 11795
                                laferrara44@gmail.com



Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

Proceedings

THE CLERK: Civil Cause for Settlement Conference, Xu v. Jessica Holding, Inc., docket number 16-cv-4720.

Will the parties please state their appearances for the record.

MR. BYUN: Good afternoon, your Honor.

This is Kibum Byun of Troy Law for plaintiffs.

THE COURT: And could you introduce the individuals with you at counsel table?

MR. BYUN: Yes, your Honor The gentleman standing right next to me, his name is Mr. Adam Dong. He is going to be an interpreter for me and your Honor, as well, to translate English into Mandarin and Mandarin into English, your Honor.

THE COURT: Thank you. The nice lady who is standing there is Ms. Jay Wei Xu. I'm going to refer to her as Wei because we have two individual plaintiffs who have same last name, just Ms. Wei. And the gentleman -- lady there is her sister, Ms. Feng Xu.

THE COURT: All right. And for defendants?

MR. SANTANGELO: Yes. Good afternoon, your Honor.

Michael Santangelo, 75 South Broadway, White Plains, New York.

THE COURT: And if we could have Mr. Dong raise

your right hand.

(INTERPRETER SWORN)

THE COURT: All right, thank you. Please be seated and I encourage everyone to remain seated during this proceeding, so you'll be closer to the microphones.

All right. This is on for a settlement conference. Let me explain the procedures that I typically follow in conducting a settlement conference. Then I will hear from you as to whether you have any suggestions for proceeding in a different fashion.

And did the plaintiffs need to have -- do they need simultaneous translation or is the interpreter here on a standby basis?

MR. BYUN: Mr. Dong can simultaneously interpret to my clients.

THE COURT: But do they require that?

MR. BYUN: They prefer that.

THE COURT: All right. So, Mr. Dong, if you could do simultaneous translation.

What I would like to do today is have a very detailed discussion with both sides about the underlying facts of the case. What I will do is I will hear first from Mr. Byun as to what you expect to be able to prove at trial and how you're going to prove it. Then I will hear from Mr. Santangelo. I am confident you'll be

Proceedings

hearing things you disagree with. That's the nature of litigation but rather than interrupt, I would ask you just be patient. I will give you an opportunity to respond.

After I've heard from both sides, what I would then like to do unless there's an objection is meet with each side privately and off the record, with my promise to you that what you tell me when we meet privately is not going to be disclosed unless I have your express authorization.

Following the private conferences, I will bring everyone back into the courtroom. At that time, I will tell you what I believe is a fair and reasonable resolution of the case.

I'm not going to ask you to respond immediately, even though the two plaintiffs are here. I didn't require that plaintiffs be present. So Mr. Santangelo did not bring his client. So what I will do is give both sides a short period of time, probably until close of business on Monday, to respond to my proposal by calling my chambers with either an acceptance or rejection.

And I would ask counsel not to talk with one another about settlement in the interim because I want to preserve the confidentiality of your responses. I don't

Proceedings

have enough of a feel for the case to know whether my settlement proposal would be for global settlement, which would require that both plaintiffs, as well as the defendant, accept or whether I would recommend separate settlements that could result in the resolution of the claims of one plaintiff and not the other.

In many similar cases, defendants are not interested in settling unless they're buying peace as to the entire case. I haven't heard from Mr. Santangelo yet. So I don't know whether that's his client's position.

In any event, we'll wait until we hear back from both sides. At that time, we'll tell you whether or not the case is settling. If it is not settling, that's all we're going to disclose and it would be in a court order. It would simply say there's no settlement. The parties should comply with the schedule previously set by the court. If both sides or all three parties accept, then we'll give you a date for filing closing documents. We will need to have a Cheeks hearing in the case. Even if my settlement recommendation is accepted, I do require a Cheeks hearing in order to review the other terms of the settlement agreement. If this were to become a consent case, rather than staying with Judge Johnson, if I were the judge making the fairness determination, my

Proceedings

usual practice in order to streamline the process is to get the parties on the telephone and do the Cheeks hearing telephonically.

So those are the procedures that I propose following.  Do either of you have any questions or suggestions for proceeding some other way?

MR. SANTANGELO:  No, your Honor.

MR. BYUN:  Not from plaintiffs, your Honor.

THE COURT:  All right.  So I will hear from plaintiffs' counsel first.

MR. BYUN:  Yes.  Your Honor, before I begin, may I approach your bench to give you what is a fairness computation that we have provided a copy to Mr. Santangelo yesterday.

THE COURT:  All right.  Do you have an extra copy so my law clerk can have one, as well?

MR. BYUN:  Yes.  Mr. Santangelo do you have copy for your records?

MR. SANTANGELO:  No, I have one here.

MR. BYUN:  Yes.

THE COURT:  Thank you.

MR. BYUN:  And a copy for your Honor.

THE COURT:  All right.

MR. BYUN:  Yes.  Your Honor, this case has been brought under the FLSA and under New York Labor Law.  My

clients here, the Xu sisters, work at defendants as (indiscernible).

THE COURT: As I said, you can remain seated. I would actually prefer it because you will be closer to the microphones.

MR. BYUN: Yes, your Honor.

THE COURT: I know, force of habit. You're not alone.

MR. BYUN: Okay. They work as casino tour guide. They sold tickets for dependents for a -- tickets for bus to casinos and Ms. Wei Xu was doing that for some period of time but then her job duty will change as an officer worker at the defendant tour guide company.

The parties have exchanged discovery. The parties have conducted deposition for the -- each party, so discovery is closed at this moment. And the one thing that is very clear from our extensive discovery is that defendants do not have a contemporaneous record of plaintiffs. They do not keep those records as required by the law.

And that the standard chart that we have provided to your Honor and Mr. Santangelo last night, we tried best to our ability to reflect all those facts that was discovered from the discovery.

THE COURT: You say there was extensive

Proceedings

discovery. That's not my recollection. Why don't you --
have the plaintiffs been deposed?

MR. BYUN: Yes, your Honor.

MR. SANTANGELO: No, Judge, not all of them.
Just my -- just one client.

THE COURT: I said plaintiffs.

MR. SANTANGELO: Oh, I am sorry.

THE COURT: The plaintiffs have been deposed?

MR. SANTANGELO: Yes, your Honor.

MR. BYUN: Two of our plaintiffs have been
deposed, yes.

THE COURT: And one representative of the
defendant has been deposed?

MR. SANTANGELO: Correct, Judge.

THE COURT: And can I just -- before we get
into the specifics of the hours, you said that the
plaintiffs were both tour guides but from your
description of what they did, you said they sold tickets.

MR. BYUN: Yes.

THE COURT: That doesn't sound like a tour
guide.

MR. BYUN: Yes, your Honor. Let me -- if you
don't mind, I will explain to you about that. They were
tour guide but they were -- what they did is they sold

Proceedings

tickets on the outside, in the Flushing area to Chinese community where they sold tickets and for some period of time of their employment, they rode bus together with the customers. They went to the casino with those customers and they hd to stay there and they come back with the customer to New York City when they had bus ride to Foxwoods Casino.

And after --

THE COURT: So are you saying that they both sold the tickets and they accompanied the patrons who purchased the tickets?

MR. BYUN: Yes, for some time period, not all. That is from beginning of the employment to the 2013, July, 28th. That's when the defendant stopped service to the bus -- service to Foxwoods Casino. After that --

THE COURT: I'm sorry, July 28th of which year?

MR. BYUN: 2013, your Honor.

THE COURT: So until 2013, they sold tickets and rode the bus.

MR. BYUN: Yes.

THE COURT: And when did they start their employment? My recollection is there's a dispute about this.

MR. BYUN: Yes. Ms. Wei Xu worked for defendants since 2011, November, your Honor. And Ms.

Proceedings

Feng Xu worked from -- for defendants since April of 2012.

THE COURT: All right. What happened -- well, why don't we focus on the period until July 28th of 2013, tell me what their hours were.

MR. BYUN: Yes, for Ms. Wei Xu, when she was a tour guide, when she had to ride the bus to Foxwoods Casino --

THE COURT: That was until July 28th of 2013?

MR. BYUN: July 27 or July -- so it's not very clear. It's either 27 or 28.

THE COURT: So starting in November of 2011?

MR. BYUN: No, Ms. Feng started from April 2012.

THE COURT: Right, but I thought we were talking about Wei now.

MR. BYUN: Oh, okay, Wei. Yes.

THE COURT: I don't care which one we discuss first but you said you were focusing on Wei.

MR. BYUN: Yes, of Ms. Wei -- Ms. Wei was working out, she start her bus ride from 3:30 afternoon. She came back to New York next day in the morning, 5 -- around 5:15 a.m. That's for the period between 2011, November to 2013, July, when they stopped the services to the Foxwoods Casino.

THE COURT: And how many days per week?

MR. BYUN: Five days, your Honor.

THE COURT: Was she given any breaks?

MR. BYUN: Not as required by the law, your Honor. She was there no designated time period for her break, your Honor.

THE COURT: Well, the law doesn't require a specific designation of a time, so what -- I'm sure this is going to be an issue, as well. So why don't you tell me what your theory is?

MR. BYUN: Yes, that for the time that she rode, she had to stay awake. She had to go to casino with the customers, accompanying them and staying there to assist them if they need to switch the chips. She has to go there and help them out. She was there as a job duty, not as a person -- reason that she was required to go to casino and was required to stay at the casino, that was her job description during that time.

THE COURT: And how many tour guides wold be on a bus on any single bus?

MR. BYUN: They have multiple busses. So for this bus -- this particular -- she had a very particular time of scheduled bus, defendants operate multiple bus. For this bus, I believe it was Ms. Xu alone, right? Yes.

THE COURT: So there was no other tour guide on

Proceedings

that bus.

MR. BYUN: On that bus but there was multiple buses.

THE COURT: For the same trip?

MR. BYUN: No, same trip but different time. They depart from different time schedule. The discovery we have others time schedule for the first departure during the time defendants was operating bus tour to Foxwoods Casino.

THE COURT: All right.

MR. BYUN: And after that, after either July 27 or July 28, they official stop operating the bus on July 28 but after that, she start working at the defendants' office as an officer worker. And she testified during deposition, she worked on slow time, she worked five days per week. And on busy, busy, busy time, she worked six days per week.

And she testified during deposition that she always -- she never worked less than eight hours per day. However, on Sunday when she worked on Sunday, she only work from 10 a.m. to 3 p.m., which is five hour, your Honor.

The damage calculation is basically a rough estimation of those periods when she worked five days only and or six days per week.

THE COURT: All right. Let me hear about the co-plaintiff.

MR. BYUN: Yes. Ms. Feng Xu had similar job duty as Ms. -- her sister, Ms. Wei Xu for -- from April of 2012 to same time, 2013, July of -- to July of 28. She had same job duty. She had to sell tickets. She had to go to casino and they had to stay there with the customers and her working hour was a bit different, basically her -- she arrived from different on which day she ride. For example, on Saturday and Sunday, she had same bus schedule, 3:30 to 7:15 -- 5 a.m. -- a 5:15 a.m. trip. But for weekdays, on Thursday and Friday, her bus depart on 7 p.m. and she came back to New York on 8 a.m.

So she worked four days per week during this time period from 2012, April 2nd, to 2013, July 9th -- 19th but for about one week, she had different schedule where she worked 3:30 p.m. to -- same schedule -- yeah, pretty much same schedule but she did not have any day off for about a ten-day period, until defendants stop operating bus tour to Foxwoods.

After that, her job duty had changed. Basically, after they stopped operating bus to Foxwoods, her only job was selling tickets to the bus and for this period, she sold tickets. She had a very regular schedule and I don't think it's much disputed from 4 p.m.

to 11:15, she sold tickets until end of her job employment.

And we have produced -- actually, Ms. Feng Xu keep the notes for herself, so she kept the dates -- days when she worked. Yes, she kept --

THE COURT: Have those been produced?

MR. BYUN: Yes, we have produced to defendants that she kept her notes herself, which dates she worked, how many tickets she sold. She kept her notes for herself and we have produced this document.

THE COURT: Oh, is this only as a ticket seller?

MR. BYUN: No, it's for all her employment period. She kept very good notes. It doesn't have what time she worked but it has which day she showed up to work and how many tickets she sold --

THE COURT: Does it have the number of hours she worked?

MR. BYUN: No, no.

THE COURT: And what was the arrangement of each of the plaintiffs with the defendant in terms physical force employment and payment?

MR. BYUN: Yes. For Ms. Wei Xu, for period from 2011, to November 1st to February 20th, she received payment semi-monthly basis but what my client has

Proceedings

received was daily rate. Basically, whenever they show up to work, they count that as still work.

From beginning of employment to about 2014, December 29th, her daily rate was $80. Meaning if she worked five days per week, she was receiving $400. It's about that. But she was receiving those rates on semi-month period from 2011 November to March of 2014.

But from March --

THE COURT: I thought you said that was till December 29th of 2014.

MR. BYUN: No, it's February 28th of 2014. She was receiving payment in semi-month basically, basically first day in 16 --

THE COURT: Oh, so her daily rate was until when?

MR. BYUN: Daily rate was same until 80, but it was raised to 85, your Honor, from --

THE COURT: No, no, no, but she received $80 until what date?

MR. BYUN: Till November -- December 28th, your Honor. That's how they --

THE COURT: Of what year?

MR. BYUN: Of 2014, your Honor. That's how they pay her -- how often they paid her. And from that time to end of her employment, which is June 30 of 2016,

Proceedings

her daily rate was raised to $85 per day but one thing to be noted, is that she received not bimonthly but she received biweekly, meaning every two weeks she received of the payments since March of 2014 to end of her employment period, your Honor.

THE COURT: All right.

MR. BYUN: And Ms. Feng Xu has similar pay schedule but she received $80 until the end of her employment period. But from 2012 to 2013, they went -- during the time she was tour guide, she received $200 on weekly basis, your Honor. $50 per trip a day, yes.

THE COURT: You said she got $80 per day. So I am a little confused --

MR. BYUN: Yes, yes.

THE COURT: -- how she could get $80 per day and $200 per week.

MR. BYUN: Yes, I would --

THE COURT: Was that on top of it?

MR. BYUN: No, no. Can I explain to you, your Honor? For the -- during the time she had to go to the trip to Foxwoods, she had four trips every week, as I explained to you. She worked four days per week.

THE COURT: Ah.

MR. BYUN: She received $50 for each trip. So basically, she received $200 per week. But after they

stopped operating the bus, sometime on July of 2013, when she was working as the ticket seller for the buses, she receives same as -- same as  her sister, her daily rate was $80.

THE COURT:  Well, her sister at some point was getting $85.

MR. BYUN:  Yeah, but she -- Ms. Feng Xu never got the raise.

THE COURT:  All right.

MR. BYUN:  And how they paid, $80 per day or $85 per day of a -- that's how they calculate, I don't think that's much in dispute because defendants have produced their payment receipt.  So --

THE COURT:  Well, how were -- were they paid by check, by --

MR. BYUN:  Cash, your Honor.

THE COURT:  But the defendants had records of the cash payments?

MR. BYUN:  Yes, your Honor.

THE COURT:  All right.  Anything else you want to add?

MR. BYUN:  That's the facts that -- from plaintiffs, your Honor.  And both parties have exchanged number for settlement before the --

THE COURT:  Okay.  I don't want to get into

Proceedings

specifics about settlement discussions while we're on the record.

All right. I'll hear from Mr Santangelo.

MR. SANTANGELO: Yes. Judge, initially there was a dispute and there is somewhat of a dispute whether they were tour guides, per say. They received tips on these buses.

It's interesting to note that when Foxwoods ended, Resorts started and they did not follow -- get on a bus and accompany patrons to Resorts. But I think one of the most important things in the Foxwoods era, is Ms. Feng Xu's testimony where she indicates that she herself bought the tickets. She paid $600 a week for the tickets, borrowed the money from her parents and made only $470 a week; $50 per day plus $45 tips. So she was losing $130, according to her, a day, but continued to take the bus to Foxwoods.

It doesn't make a lot of sense to me as to -- and her sister said she never paid for the tickets. She never bought the tickets herself. So the Foxwoods issue, we have no records. We have no records to dispute hours and I know counsel has indicated four days a week. We agree with that.

But the real issue, Judge, comes after I think Foxwoods.

Proceedings

THE COURT: Well, let me see if I understand. I thought that Wei's claims to have been working five days per week. It was Feng who says she worked four days but according -- at least according to my recollection of what Ms. Byun said, Wei was working five days per week. Is that disputed?

MR. BYUN: Wei worked five days. Feng worked four days.

MR. SANTANGELO: No, I am not going to dispute that, Judge.

THE COURT: All right.

MR. SANTANGELO: So after that period of time, Foxwoods ends. At some point, Joy Wei goes into the office. Works in an office that's open from 9 to 6:30. And her sister sells tickets to Resorts.

During that time, we have each month, pay statements, the number of hours worked a day, how much was paid, signed by the defendants themselves. When asked about that, they said, well, they were in a rush and it must have been added after but if you looked at every single pay stub, every single month, for both individuals, there's extensive writing. In fact, it's -- her daughter even writes on these, my client's daughter.

So their only defense to the hours that we have after that is that well, we signed it, we were in a rush.

Proceedings

They also took the office schedule from my client which is printed daily and showed the number of days off that Wei Xu had. I know counsel says she worked six days a week, seven days, sometimes Sundays. They took the schedule and they have that and counsel doesn't --

THE COURT: Wait. I am not following you when you say they took the schedule, you're saying at the time they were working there --

MR. SANTANGELO: Yes.

THE COURT: -- they took the schedule?

MR. SANTANGELO: Yes.

THE COURT: But the defendant maintained a copy of the schedule?

MR. SANTANGELO: Yes. And we have a copy from them actually. And that pretty much sets out the days off she had, unless they dispute that which I don't know whether they have.

With respect to Feng Xu --

THE COURT: And these schedules were for what period of time?

MR. SANTANGELO: These schedules, I believe go back to 2013, Judge.

THE COURT: So this is post-Foxwoods again?

MR. SANTANGELO: I believe so, yes.

Now, Ms. Feng Xu candidly admitted her time

that she worked selling tickets for Resorts and she indicated, which is not in dispute, that she worked from 4 to 11:15 p.m.

She also admitted that it was approximately seven hours a day and she documented that with her own notes and, in fact, testified that it was no more than five days a week.

So the claim of Feng Xu working all these overtime hours after that is heavily in dispute based on her own testimony.

THE COURT: Did anyone bring a copy of her testimony, the deposition testimony?

MR. SANTANGELO: Yeah, we have a -- I have computer files of that --

THE COURT: All right.

MR. SANTANGELO: -- deposition transcript and her notes.

THE COURT: Mr. Santangelo, you may continue.

MR. SANTANGELO: Yes.

(Pause)

THE COURT: Mr. Santangelo?

MR. SANTANGELO: Yes, Judge. I'm just seeing if I have anything left.

I believe both sisters now have their own travel agency company, if I am not mistaken. My client

Proceedings

has been in the business some 25 years.  My client testified that she treated them like they were daughters, that they wanted to work and they asked to be paid a certain way.  That's in dispute.

But having worked with my client through this time, this is not a woman that took advantage.  Many cases I have seen in these cases are sweat shops where people take advantage and use someone ridiculously.

The only real evidence here at this time is the Foxwoods trip itself and those trips, I don't believe they were required to go on those buses.  They claim they were.  My client says they weren't.  They could have just sold tickets.

But in any event, I looked at the damage calculations and that's giving the defendants the benefit of every single doubt or every dispute and I think some of it's belied by Feng Xu's own testimony that she worked from 4 to 11:15 every day.

THE COURT:  Well, I thought that was after Foxwoods.

MR. SANTANGELO:  After.  Yes, after, Judge.

THE COURT:  But in terms of the trips, assuming for the sake of argument, that they were required to accompany these people on the buses, is the amount -- is the departure and return time disputed?

MR. SANTANGELO: That we can't dispute because we don't have records and, you know, it's their testimony.

THE COURT: All right. Anything else?

MR. SANTANGELO: No, Judge, that's it.

THE COURT: MR. Byun, did you want to respond?

MR. BYUN: Yes, your Honor. Ms. Xu testified on some occasion --

THE COURT: Okay. Which, you're talking about Feng now?

MR. BYUN: Yes, Feng when she stopped working, stopped going to Foxwoods, she worked -- she testified -- she just told me she testified she worked every day. I mean, there must be some confusion in that deposition testimony but we have her notes that she put -- she take notes how many tickets she sold and how much she sold the tickets for a daily basis.

Those records show that she worked regularly six days per week. More weeks she worked all seven days per week. I will show to your Honor that her notes, she took during those time period, that she work almost every day when she --

THE COURT: Well, did she buy the tickets herself? Mr. Santangelo said she testified that she, in fact, bought the tickets and then she sold them on her

Proceedings

own.

MR. BYUN: That's not -- when she worked for Foxwoods. When she was going to Foxwoods, she had to buy those tickets and that's why she testified she bought the tickets from defendants, she sold the tickets to the customer.

THE COURT: So are you suggesting that at times that she was selling the tickets which were now hers, that she was operating as an employee of the defendant?

MR. BYUN: Yes, but she nonetheless was required to perform a lot of job for defendants and she was actually getting paid $50 per trip by defendants for those trips.

THE COURT: I understand that but in terms of the number of days that she worked, how many days per week was she on the bus?

MR. BYUN: Four days when she was going to Foxwoods.

THE COURT: All right. But you say she worked six to seven days per week.

MR. BYUN: That --

THE COURT: Those other days she was selling tickets?

MR. BYUN: No, that's four days per week, as only the time period when she was going to Foxwoods and

Proceedings

those buying tickets and selling tickets, only those time period when she going to beginning of her employment, when she was going to Foxwoods.

But you changed after July of 2013, she didn't buy the ticket and she didn't work four days. She basically worked almost every day, your Honor.

THE COURT: Six to seven days per week?

MR. BYUN: Yes, we have her notes. Yes. Keeping --

THE COURT: But did she sign records that suggested that she was working fewer days per week?

MR. BYUN: The record is actually put out of -- defendants produced a daily payment. What they have is how many days she worked and times -- multiplied by 80 times, 80. And those records are pretty consistent, your Honor. That in two weeks period, she worked 12 days, 13 days. On some occasion, she worked 14 days, your Honor.

THE COURT: According to the defendants' records?

MR. BYUN: Yes, they have the record, pay records, showing $80 and how many days she worked.

THE COURT: Well, I am a little confused, so I will have to take a look at those records.

All right. Anything else?

MR. BYUN: For the factual issues, not from

Proceedings

plaintiffs, your Honor.

THE COURT:  Mr. Santangelo?

MR. SANTANGELO:  Just -- it just defied logic, her testimony that she would borrow money from her parents to buy these tickets at $600 and not make that much and make $470 a week at most and that defies logic, number one.  And I believe number two, she testified she worked five days a week, not six or seven during the time after Foxwoods.  Now whether her notes dispute that, that's a different issue.

THE COURT:  Do they?

MR. SANTANGELO:  I asked her if her notes were accurate and I asked her did she work five days a week and she said yes, five days a week right through the end.

THE COURT:  Feng says she bought the tickets for $600, according to your characterization of her testimony.  Is that consistent with the defendants' position that she bought the tickets and then she could sell them on her own for whatever?

MR. SANTANGELO:  Defendants position was she was never given money to buy tickets.  So it is -- does make sense why they would buy tickets and want to go on the bus because it was mostly for tips.  They were getting $45 from the patrons and they were making money.

Proceedings

But my client never sent them out and said go buy tickets and you're only going to make $470 a week but spend $600 and borrow that from your parents to have a job. That defies logic.

MR. BYUN: My client has told me --

THE COURT: I'm not following this. How much was a ticket to go to Foxwoods? If a customer wanted to go on this overnight trip?

MR. BYUN: $10. $10, your Honor.

THE COURT: Is that your understanding, Mr. Santangelo?

MR. SANTANGELO: Yes, Judge. And -- $600 is what she said.

UNIDENTIFIED SPEAKER: The full bus is $600 but if you -- yesterday if only 30 customer go to Foxwoods, you only setting that $300. So tomorrow you give bus $300. That bus give it three ticket -- 300 tickets. So you continue. You just put up $600 for one bus only.

MR. BYUN: For how many days?

UNIDENTIFIED SPEAKER: Every day because the buses -- the full seat is 60. So 60 customer is $600 if the bus is full, right? So today I working, I setting maybe the full bus, 600. It changes also (indiscernible). So tomorrow I bring the $600 to give to the bus. Bus gave me 60 tickets. So next day maybe 30

customers going to Foxwoods. I got $300. So I give bus $300. So bus gave me 30 tickets back. So only $600, not every day buy 60, $600 for monies.

THE COURT: Mr. Byun, can you clarify? Was your client --

MR. BYUN: My --

THE COURT: -- buying the tickets or was she simply collecting the money from the customers? I am unclear.

(Counsel and client confer)

UNIDENTIFIED SPEAKER: Because bus have 12 buses, so it's big monies. Everybody got a 600 --

THE COURT: Well, that's not answering my question. I asked your lawyer to clarify.

(Counsel and client confer)

MR. BYUN: For Ms. Wei, she didn't pay from her own pocket. She just collecting the money. For Ms. Feng Xu, she had to buy ticket to sell it but not $600 --

UNIDENTIFIED SPEAKER: Not (indiscernible).

MR. BYUN: Not everyday, your Honor, but it was more my client's description it was more of (indiscernible). She make $600. It depends on how much you sell. Next (indiscernible) maintain till next day.

THE COURT: All right. Anyone else want to add anything?

Proceedings

MR. SANTANGELO:  No, Judge.

MR. BYUN:  No, your Honor.

THE COURT:  Any objection if we go off the record at this point?

MR. SANTANGELO:  No, Judge.

MR. BYUN:  No objection, your Honor.

(Off the record.)

THE COURT:  All right.  I have made my settlement recommendation off the record.  This is for a global settlement that would require both plaintiffs as well as the defendants to agree to it.  I'm giving the parties until close of business on Monday, July 10th, to respond.  The way you would respond and you do this without talking with opposing counsel, is to contact my chambers by telephone.  The phone number in chambers is 718-613-2350.  When you call, you can talk with any member of my staff, identify the case, the docket number, who you represent, and whether your client accepts or objects the settlement proposal.

If your client doesn't like the settlement proposal, just reject it.  Don't come back with a counter offer.  My staff is not going to negotiate with you.

We'll wait until we've heard from both parties before issuing an order in the case, even if one party or one side responds early and rejects, we still wait until

we've heard from both sides. At that point, we'll issue an order through ECF. It will indicate if at least one party is rejected, it will say there's no settlement. It won't disclose whether that's because one side or both sides have rejected.

So we preserve the confidentiality of any acceptance unless both sides accept. If there is an acceptance by both sides, the order will give the parties a period of time for filing closing documents. If you file an executed consent form to have the case assigned to me for all purposes, as I indicated earlier, that will streamline the Cheeks review process and I'll just schedule a date for telephonic Cheeks review.

If there's no settlement, the order will say the parties are directed to comply with the schedule previously set by the Court. Have I given the parties any further deadlines such as request for pre-motion conference?

MR. SANTANGELO: I don't believe so, Judge.

THE COURT: All right. Will there be any dispositive motions?

MR. BYUN: Not from plaintiffs, your Honor.

MR. SANTANGELO: No, Judge.

THE COURT: Will there be any expert discovery?

MR. BYUN: Not from plaintiffs, your Honor.

Proceedings

MR. SANTANGELO: No.

THE COURT: All right. So then the next step in the process would be the joint pretrial order. This is Judge Johnson's case. My minute entry from today's proceeding will include a schedule for the joint pretrial order which should be prepared in compliance with Judge Johnson's individual rules.

And Mr. Byun, may I keep the calculations?

MR. BYUN: Yes, your Honor.

THE COURT: All right. Anything else?

MR. SANTANGELO: No, Judge. Thank you very much for your time.

THE COURT: All right. Thank you all very much.

MR. BYUN: Thank you, Judge.

(Matter concluded)

-o0o-

**C E R T I F I C A T E**

I, LINDA FERRARA, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **24th** day of **October**, 2017.

Linda Ferrara

AAERT CET\*\*D 656

Transcriptions Plus II, Inc.